**UNITED STATES FOOTBALL LEAGUE, et al., Plaintiffs,**

**v.**

**NATIONAL FOOTBALL LEAGUE, et al., Defendants.**

No. 84 Civ. 7484 (PKL).

United States District Court, S.D. New York.

Oct. 2, 1986.

Finley, Kumble, Wagner, Heine, Underberg Manley, Myerson & Casey, Spengler Carlson Gubar Brodsky & Frischling, New York City, for plaintiffs.

Davis Polk & Wardwell, Skadden, Arps, Slate, Meagher & Flom, New York City, Covington & Burling, Washington, D.C., for defendants.

LEISURE, District Judge:

In this action, the United States Football League and certain of its member clubs (hereinafter collectively referred to as the "USFL") have brought suit against the National Football League, its commissioner and certain of its member clubs (hereinafter collectively referred to as the "NFL") for the NFL's alleged violations of Sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2, and of the common law. After ten weeks of trial, the jury unanimously rendered a series of general verdicts and answered numerous special interrogatories by entering their responses on a jury verdict sheet, Court Exhibit 16, which had been prepared by the Court after con-

sultation with the parties and due consideration of their respective objections.

With regard to the USFL's claim of actual monopolization, the jury found the NFL liable, concluding that defendants had willfully acquired or maintained monopoly power in a relevant market consisting of major league professional football in the United States. *See* Court Exhibit 16 at 3 (Question No. 4).[1] The jury also found that the NFL's unlawful monopolization of a relevant market had caused injury to plaintiffs' business or property. *Id.* (Question No. 5). Despite these findings, the jury chose to award plaintiffs only nominal damages, concluding that the USFL had suffered only $1.00 in damages as a result of the NFL's unlawful conduct. *See id.* at 11 (Question No. 17).

Plaintiffs were less successful on the remainder of their antitrust claims. The jury found that none of the defendants had violated Section 2 of the Sherman Act by attempting to monopolize a relevant market, *id.* at 5 (Question No. 7), or by conspiring to monopolize. *See id.* at 8–9 (Questions Nos. 12–14). In addition, the jury found that even though one or more of the defendants had participated in a contract, combination or conspiracy to exclude competition within major league professional football, *id.* at 12 (Question No. 20), that combination did not constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. *See id.* (Question No. 21). The jury also found that the NFL's contracts with all three television networks for the right to broadcast the league's regular season and championship games through the 1986–87 season were not an unreasonable restraint of trade violative of Section 1. *See id.* at 14 (Question No. 24). Finally, the jury rejected plaintiffs' "essential facilities" claim, specifically finding that defendants did not have the ability to deny actual or potential competitors access to a national broadcast television contract. *Id.* at 17 (Question No. 33).

None of the defendants were found liable on plaintiffs' common law claims, *see id.* at 20, 23, 26, a result to which the USFL has not objected. The USFL has, however, moved for judgment notwithstanding the verdict with respect to each of the antitrust claims which were rejected by the jury.[2] In addition, the USFL has moved, pursuant to Fed.R.Civ.P. 59, for a new trial. The USFL has specifically requested that the new trial be limited to the issue of damages, since plaintiffs see no error in the jury's determination that the NFL unlawfully monopolized professional football in the United States.

The NFL opposes the USFL's motions in all respects, and has itself moved for judgment n.o.v. with respect to the jury's verdict on the USFL's claim of actual monopolization.

Having carefully considered all issues raised by counsel's extensive submissions, I have concluded that there is no justification for disturbing any of the jury's verdicts in this case. Accordingly, plaintiffs' and defendants' post-trial motions are denied in their entirety. The explanation for this ruling set forth below is not meant to be an exhaustive discussion of the plethora of arguments raised by counsel in their papers and on oral argument of the motions. To the extent that a specific objection to the verdicts or to the Court's jury instructions is not discussed herein, it may be presumed that the argument has been considered and found to be without merit.

## DISCUSSION

### I. PLAINTIFF'S MOTION FOR A NEW TRIAL

Plaintiffs argue that a new trial is warranted on several grounds, including: 1) jury confusion, manifested by the jurors' public statements and by the inconsistency

---

1. The jury specifically found NFL Commissioner Alvin R. Rozelle not liable on the USFL's claim of actual monopolization. *See* Court Exhibit 16 at 4 (Question No. 6).

2. Plaintiffs have not challenged the jury's finding that NFL Commissioner Rozelle was not liable on any of the USFL's claims.

of the verdicts; 2) the compromise nature of the verdict; 3) the inadequacy of the award; and 4) the trial court's failure to give correct instructions, particularly with respect to damages. ·

### A. *Jury Confusion*

Under Fed.R.Civ.P. 59(a), "[a] new trial may be granted ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law." The NFL does not dispute the proposition that "[a] trial judge may order a new trial if he suspects that the jury verdict reflects confusion." *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.,* 729 F.2d 1530, 1538 (5th Cir.1984). Defendants do, however, take issue with the admissibility of certain evidence offered in support of plaintiffs' claim of jury confusion, as well as to plaintiffs' insistence that the jury's verdicts are so irreconcilable that a new trial must be granted.

### 1. *Post-Trial Statements by Jurors*

■ The USFL's lawsuit against the NFL attracted an extraordinary amount of public attention through the media. The trial was covered on a daily basis by many newspapers throughout the country, and was the subject of analysis on several network and cable television programs. Following the verdict, those jurors courageous enough to exit the courthouse by the front door were immediately surrounded by swarms of reporters eager to develop a story. Although an experience to which they were obviously unaccustomed, a few jurors did choose to subject themselves to interviews, both on that afternoon and the following day. The comments elicited from two jurors in particular, Miriam Sanchez and Margaret Lilienfeld, were widely publicized. In moving for a new trial, the USFL has cited the public comments of Mrs. Sanchez, Mrs. Lilienfeld, and two other jurors, in response to the reporters' various inquiries, as clear evidence that the verdict in this case was the result of jury confusion. *See generally* Plaintiffs' Memorandum of

Law in Support of Motions for New Trial and for Judgment N.O.V. on Certain Claims ("Plaintiffs' New Trial Memorandum") at 53–56; Affidavit of Harvey D. Myerson ("Myerson Aff.") and Exhibits ("Ex.") 1–40 annexed thereto (newspaper articles; transcripts of television and radio broadcasts; videotaped and audiotaped segments of television and radio broadcasts).

Specifically, the USFL asserts that the jurors' post-trial statements demonstrate: 1) that at least one juror, Mrs. Sanchez, agreed to award the USFL a single dollar in damages based upon her belief that the Court could increase the amount of damages; and 2) that the jurors were generally confused, both by the Court's instructions and by their own notions of the possible consequences of their verdict.

The USFL's desire to impeach the verdict by what plaintiffs have described as the "public record of confusion" raises a threshold issue—whether this Court may properly consider any evidence of post-trial statements by jurors in deciding plaintiffs' motion for a new trial.

At common law, it was well-settled that "a juror cannot impeach his own verdict," and that courts should not disturb "verdicts solemnly made and publicly returned ... on the testimony of those who took part in their publication." *McDonald v. Pless,* 238 U.S. 264, 267, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915). According to the United States Supreme Court, a general rule of juror incompetency was necessary to avoid "mak[ing] what was intended to be a *private* deliberation, the constant subject of *public* investigation—to the destruction of all frankness and freedom of discussion and conference." *Id.* at 267–68, 35 S.Ct. at 784–85 (emphasis added); *accord Ohanian v. Avis Rent A Car System, Inc.,* 779 F.2d 101, 110 (2d Cir.1985).

In *McDonald,* the Court declined to adopt an "inflexible rule" barring post-trial testimony by a juror, since "there might be instances in which such testimony ... could not be excluded without 'violating the plainest principles of justice.'" *Id.* at 268–69, 35 S.Ct. at 784–85. The Court declined,

however, to enumerate the exceptions to the general rule. *See id.* Eventually, Congress enacted Federal Rule of Evidence 606(b), which set forth the rule of *McDonald* and codified its exceptions. That rule provides as follows:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.

Fed.R.Evid. 606(b).

Plaintiffs insist that Rule 606(b) does not render the post-trial statements of Mrs. Sanchez and other jurors incompetent for purposes of impeaching the jury's verdict. First, plaintiffs argue that Rule 606(b) does not apply because the statements were made spontaneously to courtroom observers and were in no sense prompted by the importuning or harassment of jurors by the disappointed parties or their counsel. While there is little doubt that Rule 606(b) was designed in part to prevent the latter egregious conduct, *see* 120 Cong.Rec. 2374–75 (1974); *cf. McDonald v. Pless,* 238 U.S. at 267, 35 S.Ct. at 784, nothing in the rule's language even remotely suggests that the mere absence of improper conduct by the parties or their counsel opens the floodgates to the admission of juror statements concerning the jury's decisional process. Moreover, federal courts have consistently applied Rule 606(b) to exclude juror statements voluntarily made to third parties, *see Scogin v. Century Fitness, Inc.,* 780 F.2d 1316, 1318–20 (8th Cir.1985) (court bystand-

er), or to the press, *see United States v. Friedland,* 660 F.2d 919, 927–28 (3d Cir. 1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982) (juror interview published in newspaper).

Second, plaintiffs argue that statements by Mrs. Sanchez to the effect that she agreed to award the USFL one dollar only because she believed the Court would then calculate appropriate damages, *see, e.g.,* Myerson Aff., Ex. 15, are admissible to prove jury confusion because such a belief could only have been based on extraneous information, a circumstance which renders Rule 606(b) inapplicable. Indeed, Congress specifically provided that "a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention." Fed.R. Evid. 606(b). However, in the absence of any substantive proffer regarding juror exposure to extraneous information, plaintiffs' argument does not warrant serious consideration. Moreover, even if Mrs. Sanchez's notion that the jury's damages award could be judicially increased were traced to an unacceptable source, it is doubtful whether her testimony could be used to impeach the verdict unless the Court were also convinced that she had shared her misconceptions with the rest of the jury. *See United States v. Eagle,* 539 F.2d 1166, 1170 (8th Cir.1976), *cert. denied,* 429 U.S. 1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977) ("A central purpose of the rule of juror incompetency is the prevention of fraud by individual jurors who could remain silent during deliberations and later assert that they were influenced by improper considerations."). Plaintiffs' own "evidentiary" submissions, however, suggest that this juror may have kept her thoughts to herself. *See* Myerson Aff., Ex. 5 (newspaper article quoting juror Lilienfeld's statement that "there was never any notion in my mind that we were tossing the issue of damages back into the lap of the court").

Finally, plaintiffs make the sweeping argument that Rule 606(b) should not be applied to render juror statements incompetent when those statements concern a ver-

dict that has been "publicly impeached," by the widespread dissemination of the jurors' post-trial comments, *see* Plaintiff's New Trial Memorandum at 60–61, and by the "public ... furor over an incomprehensible and unjust verdict." Plaintiffs' Reply Memorandum of Law in Support of Motions for New Trial and for Judgment N.O.V. on Certain Claims ("Plaintiffs' New Trial Reply Memorandum") at 22. In making this argument, the USFL is asking this Court to do nothing less than negate a rule of competency enacted by Congress on the fortuitous grounds that the harsh glare of publicity has descended upon a jury which has faithfully executed its civic obligation to discharge a verdict. Yet the USFL insists that such an approach would be consistent with the Second Circuit's analysis in *United States v. Moten,* 582 F.2d 654 (2d Cir.1978), in which the Court declared that "[t]he exclusionary rule [of Fed.R.Evid. 606(b)] is not absolute ..., but yields to the need for juror testimony in situations where there is a reduced potential for harassment or embarrassment of jurors." *Id.* at 664. Plaintiffs fail to recognize, however, that the Court in *Moten* was specifically concerned with the admissibility of juror testimony regarding extraneous information improperly brought to the jury's attention, *see Moten,* 582 F.2d at 665, an issue which is not before this Court.

Under the circumstances of this case, I do not hesitate to find that the post-trial statements by jurors offered by plaintiffs for the purpose of impeaching the jury's verdicts are inadmissible under Fed.R.Evid. 606(b) and may not be considered as evidence of jury confusion.[3]

---

**3.** Although the out-of-court declarations proffered by plaintiffs are inadmissible, it is far from clear even from the statements cited by plaintiffs that any jury confusion existed, or that the verdicts and the damages awarded were the result of anything besides the legitimate process by which a jury reaches a consensus. For example, although juror Sanchez may have believed that the USFL could be awarded additional damages by this Court or by some other agency, her statements to the media, as quoted in plaintiffs' papers, also demonstrate that this expectation was not material to her verdict and

### 2. *Inconsistency of Verdicts*

Plaintiffs contend that jury confusion in this case is demonstrated by inconsistencies among the separate verdicts, and by numerous inconsistencies in the special interrogatories that accompanied the general verdict. In response, the NFL argues that the verdicts are not inconsistent, and that any superficial anomalies in the jury's findings can and must be reconciled by this Court.

#### a. *Inconsistency among Verdicts*

The first question to be considered is whether an inconsistency among the verdicts, even if proven, would constitute sufficient grounds for a new trial. Defendants' position, that inconsistent verdicts on separate claims in a civil action are fully permissible, appears to be consistent with the law of this Circuit. *See Globus v. Law Research Service, Inc.,* 418 F.2d 1276, 1290 n. 17 (2d Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970) ("consistent verdicts are not, in themselves, necessary attributes of a valid judgment [in a civil action]"). Indeed, the Second Circuit has specifically indicated that it will tolerate inconsistent verdicts in seaman injury cases even when the jury's findings are apparently in conflict. *See Henry v. A/S Ocean,* 512 F.2d 401, 405 (2d Cir.1975) (citing cases). In the words of Judge Weinfeld, "[i]nconsistent verdicts upon different counts or claims are not an anomaly in the law, which at times recognizes a jury's right to an idiosyncratic position, provided the challenged verdict is based upon the evidence and the law." *Malm v. United States Lines Co.,* 269 F.Supp. 731, 731–32

---

that the jury's award of nominal damages was attributable to the failings in plaintiffs' damages proof. *See, e.g.,* Myerson Aff., Ex. 26 ("We couldn't compute the damages.... [because] [i]t was so complicated and we did not feel that [the] economy could be ... visualized on future damages."). Moreover, statements by other jurors, also included in plaintiffs' papers, confirm that any misconception regarding the jury's exclusive responsibility for determining damages was not a part of the jury's deliberations. *See* Myerson Aff., Ex. 27 (statements of jurors Lilienfeld and Sibilia).

(S.D.N.Y.), *aff'd per curiam*, 378 F.2d 941 (2d Cir.1967).

Plaintiffs have attempted to distinguish the foregoing authority by arguing that in a case such as this, in which the jury has rendered general verdicts and answered special interrogatories, Fed.R.Civ.P. 49(b) expressly authorizes new trials based on inconsistent verdicts or answers. *See Merchant v. Ruhle*, 740 F.2d 86, 88–89 (1st Cir.1984) (if Rule 49(b) applies, the court is obligated to scrutinize the jury's findings for irreconcilable inconsistency). The problem with this argument is that Rule 49(b) speaks to the procedure to be followed when a general verdict is inconsistent with the special interrogatories; it does not expressly enact a procedure for reconciling inconsistencies *among* verdicts.[4]

■ Nonetheless, even if Rule 49(b) is not directly applicable, this Court does not doubt its inherent authority to order a new trial in the face of verdicts which are wholly inconsistent. *Cf. Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1430 n. 5 (10th Cir.1986) (McKay, J., concurring in part and dissenting in part) (even where a party waives its right to object to inconsistencies in the verdicts under Rule 49(b), the trial court retains broad discretion under Rule 59 to grant a new trial *sua sponte* on the same grounds). At the same time, the Seventh Amendment imposes upon courts a constitutional obligation to search for an interpretation of the case which reconciles the verdicts, *see Gross v. Black & Decker (U.S.), Inc.*, 695 F.2d 858, 867 (5th Cir.1983), and which respects the principle that "juries are not bound by what seems inescapable logic to judges." *Morissette v. United States*, 342 U.S. 246, 276, 72 S.Ct. 240, 256, 96 L.Ed. 288 (1952). *See also Machleder v. Diaz*, 801 F.2d 46, 57 (2d Cir.1986) ("The role of the appellate court is to adopt a view of the case—if there is one—that resolves any

seeming inconsistency in the jury's verdict.").

■ The USFL's basic argument is that the jury's finding that the NFL willfully acquired or maintained monopoly power is wholly incompatible with its verdicts absolving defendants of liability on the rest of plaintiffs' antitrust claims. Plaintiffs have, in effect, adopted a "domino theory" of antitrust law—if the defendants are liable on one count, they must be liable on all.

Plaintiffs have made several specific arguments of verdict inconsistency. The first of these arguments relates to the jury's finding that none of the defendants were liable on the USFL's conspiracy to monopolize claim. The jury reached this verdict despite finding that there was a conspiracy among one or more of the defendants to acquire or maintain monopoly power in all or portions of the business of professional football, Court Exhibit 16 at 8 (Question No. 12), and that each defendant who was a member of that conspiracy joined it with the specific intent of acquiring or maintaining monopoly power. *See id.* at 9 (Question No. 13). Nonetheless, defendants were found not liable on the USFL's conspiracy to monopolize claim because the jury also found that no member of the conspiracy had committed any overt act in furtherance of the conspiracy. *See id.* (Question No. 14).

The USFL argues that if, as the jury found, the NFL willfully acquired or maintained monopoly power, *see id.* at 3 (Question No. 4), it necessarily follows that defendants must have committed some overt act in furtherance of a conspiracy to monopolize. Although this argument has an appealing symmetry, it obscures the possibility that the jury may have been directing its attention to a conspiracy unrelated to the conduct that the jury did conclude was unlawful under Section 2 of the Sherman Act. In this regard, it should be noted that

---

**4.** To the extent that Rule 49(b) does apply to the USFL's argument that a new trial is warranted because of inconsistencies among the jury's verdicts, plaintiffs have waived their right to invoke that rule's protection by failing to raise the question of inconsistency before the jury was discharged. *See* discussion *infra* at 1049. In any event, for reasons set forth *infra* at 1046–48, I have rejected plaintiffs' argument that the verdicts are fundamentally inconsistent.

in a portion of this Court's charge on conspiracy to monopolize to which plaintiffs did not object, *see* Court Exhibit G at 80, the jury's attention was specifically directed to plaintiffs' claim that "a conspiracy among the defendants is evidenced by the Porter presentation, attended by representatives of the NFL and [its] member clubs." Charge at 85.[5] In light of this instruction—and in light of the emphasis placed by plaintiffs on the Porter presentation during trial and in summation—it is not inconceivable that, in rendering its verdict on the USFL's claim of a Section 2 conspiracy, the jury focussed on the question of whether or not the NFL had actually implemented certain aspects of the Porter presentation. Thus, it is also possible that, upon determining that defendants had in fact never carried out the Porter strategy to "conquer the USFL," the jury further decided that no "overt act" had been committed, and absolved the NFL of liability on plaintiffs' conspiracy to monopolize claim. Under the circumstances, since a plausible explanation exists for the purported inconsistency in the jury's verdicts, the trial court's obligation is to accept that explanation rather than leap to the conclusion that the jury was hopelessly confused. As the Second Circuit has observed:

> [W]ith the Seventh Amendment as an august guide and limitation, we must struggle to avoid the finding of inconsistency and "attempt to reconcile ... by exegesis if necessary," the specific responses and the jury's overall judgment as to who should win and who should lose.

*Julien J. Studley, Inc. v. Gulf Oil Corp.,* 407 F.2d 521, 526–27 (2d Cir.1969) (citation omitted).

The remainder of plaintiffs' arguments regarding verdict consistency are also, upon consideration, not troublesome. The jury's finding that defendants did not attempt to monopolize a relevant market can be explained by the hypothesis that the jury found defendants liable for actual monopolization based on a determination that the NFL had unlawfully maintained monopoly power, rather than unlawfully acquired such power. Assuming the jurors believed that the NFL's monopoly power was of "pristine origin," they could easily have concluded that defendants had never engaged in an unlawful *attempt* to monopolize, but rather had engaged in predatory conduct only after having achieved monopoly status. *See Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 274 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980) (even if origin of monopoly power is innocent, the maintenance or extension of market control by the exercise of such power violates § 2).

In addition, it does not disturb this Court that the jury found that defendants' conspiracy to exclude competition and their network contracts were not unreasonable restraints of trade. As the NFL fairly points out, the jury's conclusion that defendants engaged in a conspiracy to exclude competition but that such conspiracy did not result in an actionable, unreasonable restraint of trade is entirely consistent with the jury's finding that defendants committed no overt act in furtherance of a conspiracy to monopolize. Nonetheless, plaintiffs persist in arguing that an irreconcilable inconsistency exists between the jury's verdict that the NFL monopolized professional football in the United States and its verdicts absolving the NFL of any liability under Section 1 of the Sherman Act. In this regard, plaintiffs place great emphasis on the venerable proposition that

---

5. The phrase "Porter presentation" came to be accepted during the trial as a shorthand reference to a presentation given by a Harvard Business School professor to a group of NFL-associated persons in which the professor directly suggested the use of certain tactics as part of an overall strategy to "conquer the USFL." At trial, defendants conceded that several of these suggested tactics, if they had actually been carried out, would have constituted a violation of the federal antitrust laws. Defendants also, however, offered a considerable amount of evidence designed to prove that the NFL never implemented any of the invidious features of the Porter presentation, and in fact disavowed the presentation as soon as it recognized its implications.

"a monopoly under § 2 is a species of restraint of trade under § 1." *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224–25 n. 59, 60 S.Ct. 811, 844–45 n. 59, 84 L.Ed. 1129 (1940); *see United States v. Aluminum Co. of America,* 148 F.2d 416, 428 (2d Cir.1945) (L. Hand, J.).

Once again, however, plaintiffs fail to consider the possibility that the jury did not evaluate precisely the same conduct in reaching its individual verdicts. Indeed, the Court's charge to the jury on plaintiffs' Section 1 conspiracy claim directed the jury's attention to particular allegations of unlawful conduct, *see* Charge at 98, in such a way that the jury could easily have concluded that it was being asked to evaluate a narrower course of conduct than it had been asked to evaluate on plaintiffs' actual monopolization claim.[6]

Likewise, there is no question that plaintiffs' "network contracts" claim and its "essential facilities" claim—both of which were concerned with the NFL's business and contractual relations with the networks—were based on specific aspects of defendants' economic activity which the jury might have found lawful while still concluding that defendants' behavior considered in its entirety constituted a violation of Section 2 of the Sherman Act.

In sum, any seeming inconsistencies in the jury's separate verdicts can be reconciled in a manner that belies plaintiffs' insistence that a new trial is mandated because of evident jury confusion. It may be said that the verdicts in this case are a manifestation of "[the] jury's right to an idiosyncratic position," *Malm,* 269 F.Supp. at 731. But that right can and should be exercised by jurors without fear that their faithful efforts will be disregarded by courts eager to impose their own version of justice.

### b. *Inconsistency under Fed.R.Civ.P. 49(b)*

Plaintiffs maintain that this Court's discretion in refusing to grant a new trial is limited by Fed.R.Civ.P. 49(b). That rule authorizes a trial court to "submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to the verdict." Fed.R.Civ.P. 49(b).[7] The rule also provides the trial court with the following guidance in the event that the jury's answers to the interrogatories are inconsistent with each other or with the general verdict:

When the answers are consistent with each other but one or more is inconsistent with the general verdict, judgment may be entered ... in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.

Fed.R.Civ.P. 49(b).

In pressing its argument on verdict inconsistency, the USFL have cited numerous purported inconsistencies in the interrogatory answers, often comparing an interrogatory answer related to one claim with an answer related to another claim. Nonetheless, after a careful review of the record, I remain unconvinced that any of

---

**6.** Moreover, no objection was made to the Court's delimitation of plaintiffs' allegations of unlawful conduct constituting a § 1 conspiracy. *See* Court Exhibit G at 94.

**7.** Although the Jury Verdict Sheet & Interrogatories, Court Exhibit No. 16, used in this case does not exactly coincide with the format described in Rule 49(b), both plaintiffs and defendants are in basic agreement that the interrogatories submitted to the jury are authorized and governed by the terms of that rule. *See Stanton v. Astra Pharmaceutical Products, Inc.,* 718 F.2d 553, 574–75 (3d Cir.1983) (where the interrogatories required the jury as a practical matter to arrive at a general verdict, and where the jury was charged on legal as well as factual matters, the jury was put on notice that they were responsible for rendering a general verdict on defendants' liability, and their answers to the interrogatories were governed by Rule 49(b)).

these alleged inconsistencies are so irreconcilable that a new trial is required under Rule 49(b), Rule 59, or any other authority. In general, plaintiffs' attempt at argument by juxtaposition exalts semantics over substance, and ignores the principle that:

> [w]here there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way. For a search for one possible view of the case which will make the jury's finding inconsistent results in a collision with the Seventh Amendment.

*Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962); *accord Fiacco v. City of Rensselaer*, 783 F.2d 319, 325 (2d Cir.1986).

Moreover, plaintiffs have waived their right to invoke the protections of Rule 49(b) and its provisions for a new trial based on inconsistencies in the jury's findings. After the verdicts in this case were read in open court and before the jury was discharged, counsel for plaintiffs was specifically asked whether there was "any application with respect to the verdict." Transcript of Proceedings at 7070. Counsel responded, "No application, your Honor." *Id.* This failure to bring any purported inconsistencies in the verdict sheet to the Court's attention at a time when it was still possible to "return the jury for further consideration of its answers," Fed.R.Civ.P. 49(b), constitutes a waiver of plaintiffs' right to seek a new trial under Rule 49(b). *See, e.g., Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd.*, 791 F.2d 1416, 1423 (10th Cir.1986); *Fernandez v. Chardon*, 681 F.2d 42, 58 (1st Cir.1982), *aff'd*, 462 U.S. 650, 103 S.Ct. 2611, 77 L.Ed.2d 74

(1983); *Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 534–35 (5th Cir.1974); *Barnes v. Brown*, 430 F.2d 578, 580 (7th Cir.1970); *Tennessee Consolidated Coal Co. v. United Mine Workers*, 416 F.2d 1192, 1200–01 (6th Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970); *see also Skillin v. Kimball*, 643 F.2d 19, 20 (1st Cir.1981) (only efficient time to cure possible inconsistencies in Rule 49 verdict is after the jury announces the results of its deliberations but before it is excused).[8]

### B. *New Trial Based on Compromise Verdict*

Following the trial of this action, several newspaper articles contained reports suggesting that the jury in this case had been deadlocked 3–3 on liability during its deliberations, and had reached a unanimous verdict only because of a common desire to avoid a hung jury, and only after individual jurors had become excessively tired or even physically ill. *See, e.g.,* Myerson Aff., Ex. 10, 11. The USFL argues that these reports, along with the post-trial statements by jurors upon which they were based, provide record proof that the verdict in this case was reached only by means of compromise.

For reasons already discussed, the "proof" upon which plaintiffs rely is not competent for purposes of impeaching the verdict on any grounds, including compromise. Indeed, the Second Circuit has observed that "[s]ince neither the affidavits nor the testimony of jurors are generally admissible to impeach their verdict, the verdict must be inconsistent with the facts

---

**8.** Plaintiffs argue that they preserved their Rule 49 claim of inconsistency by raising it in their motion for a new trial. *See Cone v. Beneficial Standard Life Ins. Co.*, 388 F.2d 456, 460 (8th Cir.1968); *but see Ludwig v. Marion Laboratories, Inc.*, 465 F.2d 114, 118 (8th Cir.1972) (approving waiver rule and suggesting that *Cone* is ambiguous authority in the Eighth Circuit). The problem, of course, is that by the time the objecting party has raised the issue of inconsistency in its written motion, the trial court has lost the opportunity to resubmit the interrogatories to the jury, *see* Fed.R.Civ.P. 49(b). Plain-

tiffs maintain that Rule 49(b) is still usable under such circumstances, since the rule's disjunctive character gives the trial court the alternative of ordering a new trial. *See* Plaintiffs' New Trial Reply Memorandum at 16. This argument is specious—when only one of two alternatives is left, no choice exists. The USFL's construction of Rule 49 eliminates the rule's incentives for efficient trial procedure and opens the door to the possible misuse of the rule's procedures by parties anxious to circumvent an unsatisfactory jury verdict by procuring a new trial. *Cf. Skillin*, 643 F.2d at 19–20.

adduced at trial if the reviewing court is to reverse it on the ground of an improper compromise by the jury." *Maher v. Isthmian Steamship Co.*, 253 F.2d 414, 416–17 (2d Cir.1958) (citations to New York and federal case law omitted).

▉ Moreover, even if this Court accepted the USFL's proof of a compromise verdict, such proof would not necessarily require a new trial. *See United States v. Green*, 523 F.2d 229, 235–36 (2d Cir.1975), *cert. denied*, 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976) (although trial court was correct in refusing to consider juror affidavit describing verdict's compromise nature, a new trial would not have been warranted even if the affidavit had been considered). For example, proof that a jury "compromised" by agreeing to abide by the vote of the majority is not sufficient grounds for overturning a unanimous verdict. *See Jorgensen v. York Ice Machinery Corp.*, 160 F.2d 432, 435 (2d Cir.) (L. Hand, J.), *cert. denied*, 332 U.S. 764, 68 S.Ct. 69, 92 L.Ed. 349 (1947). Similarly, there is nothing unacceptable about a single juror's reluctant decision to accede to the will of the rest of the jury. *See Grace Lines, Inc. v. Motley*, 439 F.2d 1028, 1032 (2d Cir.1971).

There are certain types of compromise verdicts, however, which have traditionally been viewed as unacceptable. For example, where a plaintiff sues in contract for a liquidated sum, and the defendant denies the obligation but not the amount, a verdict awarding plaintiff an amount substantially less than that claimed creates the inference of an improper compromise on the question of the defendant's liability. *See Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.*, 569 F.2d 181, 184 (2d Cir.1977). Such an inference may be rebutted, however, if "there is an equally rea-

sonable and perhaps even better explanation [for the verdict] which involves no jury misconduct." *Id.*

▉ In the case at bar, plaintiffs contend that the jury's award of nominal damages constituted an impermissible compromise verdict. Nonetheless, the proof offered in support of this contention is largely inadmissible under Fed.R.Evid. 606(b). Moreover, any inference of a compromise verdict in this case is easily rebutted by "an equally reasonable and perhaps even better explanation," *Ajax, supra,* namely that the jurors consciously and unanimously based their award on the Court's charge on nominal damages. Indeed, the USFL concedes the validity of such an explanation, *see* Plaintiffs' New Trial Reply Memorandum at 24, while arguing that the charge the jury may have followed was "entirely erroneous." *Id.* Given plaintiffs' concession, as well as this Court's independent finding that "the record itself viewed in its entirety [does not] clearly demonstrate the compromise character of the verdict," *Maher*, 253 F.2d at 419, a new trial is not justified on the grounds of improper compromise.[9]

### C. *Correctness of Court's Charge on Damages*

The USFL contends that a new trial on damages is required because the Court's charge on antitrust damages was both confusing and erroneous.[10] Specifically, the USFL claims that: 1) in general, the damages charge failed to apprise the jury of an antitrust plaintiff's lightened burden of proof with respect to damages; and 2) in particular, the charge on nominal damages improperly negated the Court's prior, correct charge on causation. In addition, the USFL argues that an award of nominal

9. Plaintiffs' further argument that a new trial is warranted because the trial court's charge on nominal damages was in error is considered *infra* at 1051–1054.

10. In moving for a new trial and for judgment n.o.v. on certain of the jury's verdicts, plaintiffs make numerous claims of error regarding this Court's instructions to the jury. It is not my purpose in this opinion, however, to review the

entire jury charge or all of plaintiffs' objections to its contents, especially since those objections which were timely raised were previously considered by this Court at the time the jury charge was prepared. Nonetheless, because it is so obviously material to the outcome of this trial, I consider it worthwhile to discuss the questions raised by the charge to the jury on antitrust damages.

damages in an antitrust lawsuit is inappropriate as a matter of law.

### 1. Damages Charge in General

Based on my review of the charge to the jury on antitrust damages, I am satisfied that the instructions were neither unclear nor incorrect as a matter of law.

The jury was specifically instructed as follows:

> ... the fact that it might be difficult to determine the amount of the plaintiffs' damages should not prevent you from awarding damages to plaintiffs. The law allows a party injured by conduct which violates the Sherman Act to collect damages even if the evidence does not reflect how those damages are to be calculated with mathematical precision.

Charge at 117. The jury was also told that they could not "determine the plaintiffs' damages on the basis of mere speculation or guess-work." *Id.* The proper approach, the jury was instructed, was to "look to the evidence presented to you and make a fair and reasonable estimate of the plaintiffs' damages based on that evidence." *Id.*

■■■ This admonition against awarding antitrust damages based on mere speculation or conjecture was entirely consistent with settled precedent. The relevant case law establishes two complementary principles with regard to a jury's ability to award antitrust damages. First, because the victim of antitrust injury is often unable to produce exact proof of his monetary damages, such damages may be awarded even when they have not been proven with precision. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565–67, 101 S.Ct. 1923, 1929–30, 68 L.Ed.2d 442 (1981). Second, because antitrust defendants are entitled to a fair trial on damages as well as liability, the jury "may not render a verdict based on speculation or guess-work." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). Rather, "the jury may make a just and reasonable estimate of the damage based on relevant data." *Id.*

With regard to future damages, the Supreme Court has declared that such damages "are unrecoverable if the fact of their accrual is speculative or their amount and nature unprovable." *Zenith Radio Corp. v. Hazeltime Research, Inc.*, 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). The instructions to the jury restated the *Zenith* standard nearly *in haec verba*, and also reminded the jury that even future damages did not have to be proven with mathematical precision. *See* Charge at 118.

### 2. Charge on Nominal Damages

With respect to nominal damages, the jury was given the following instruction:

> Just because you may have found the fact of some damage resulting from a given unlawful act, that does not mean that you are required to award a dollar amount of damages resulting from that act. You may find, for example, that you are unable to compute the monetary damages resulting from the wrongful act except by engaging in speculation, or guessing, or you find that you cannot separate out the amount of the losses caused by the wrongful act from the amount caused by other factors, including perfectly lawful competitive acts and including business decisions made by the plaintiffs or the plaintiffs' own mismanagement; or you may find that plaintiffs failed to prove an amount of damages. You may decline to award damages under such circumstances, or you may award a nominal amount, say $1.00.

Charge at 124.

The USFL now characterizes this instruction as plain error, and as a key source of jury confusion in this lawsuit.

#### a. Jury Confusion

■■■ Plaintiffs' motion for a new trial is based in part on the argument that the jury was hopelessly confused by inconsistencies in the charge. In particular, plaintiffs contend that the Court's charge on causation was fundamentally inconsistent with the charge given on nominal damages.

The jurors were twice instructed that in order to find defendants liable for a violation of the Sherman Act, they would also have to find that plaintiffs had shown that they had suffered an antitrust injury "because of the defendants' unlawful activity." Charge at 69, 106. The jury was also told that:

> [P]laintiffs do not have to prove that the unlawful activity that the defendants' allegedly engaged in was the sole cause of their injuries. Plaintiffs meet their burden if they show that the defendants' unlawful acts substantially contributed to their injuries, even though other facts may also have contributed significantly. An antitrust plaintiff is not required to show that the defendants' acts were a greater cause of the injury than other factors. Plaintiffs need only show that their injury to *some* degree resulted from defendants' violation.

Charge at 70 (emphasis in original); *see* Charge at 106.

The USFL does not challenge the validity of these instructions, which are clearly consistent with the established rule that a plaintiff's burden of proving the fact of damage under section 4 of the Clayton Act is satisfied by proof of *"some* damage flowing from the unlawful [conduct]." *Zenith Corp. v. Hazeltine,* 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1571 n. 9, 23 L.Ed.2d 129 (1969) (emphasis in original). Rather, plaintiffs' complaint is that, having been told that the USFL was entitled to damages even if NFL misconduct was only one of several factors that caused injury to the USFL, the jury was then told that they could award no damages, or award only a nominal amount, if they found that they could not "separate out the amount of the losses caused by [NFL misconduct] from the amount caused by other factors, including perfectly lawful competitive acts and including business decisions made by the [USFL] or the [USFL's] own mismanagement." Charge at 124.

Plaintiffs' insistence that these charges are inconsistent reflects confusion on the part of counsel rather than the jury. In the law of antitrust, there is a difference between the proof required to establish causation, *see Litton Systems, Inc. v. AT & T,* 700 F.2d 785, 823 n. 49 (2d Cir.1983), *cert. denied,* 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984) (plaintiff need only establish that the unlawful conduct "was a substantial or materially contributing factor" to injury), and the proof required to establish damages, *see MCI Communications Corp. v. AT & T,* 708 F.2d 1081, 1161 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) ("it is essential ... that damages reflect only the losses directly attributable to *unlawful* competition") (emphasis in original). *See also Zenith,* 395 U.S. at 114 n. 9, 89 S.Ct. at 1571 n. 9 (successful plaintiff must, as a threshold matter, prove that defendant's unlawful conduct caused at least some damage; beyond that point, factfinder's inquiry goes to the amount rather than the fact of damage).

As discussed earlier, once the fact of antitrust injury has been established, courts will not require that the amount of damage be proven with any high degree of specificity. But that hardly means that the plaintiff who proves causation is suddenly relieved of the obligation to present evidence that permits the jury to make some quantifiable distinction between those damages attributable to unlawful conduct and those damages caused by other factors.

For example, in *Farley Transportation Co. v. Sante Fe Transportation Co,* 786 F.2d 1342 (9th Cir.1985), the Court found that plaintiff had proved that at least some injury to its business had been caused by defendant's deviation from lawful tariff rates, *see id.* at 1350, but also found that plaintiff had failed to produce any evidence "permitting the jury to parse out which damages [were] attributable to the unlawful competition." *Id.* at 1351. In short, the plaintiff had proven the fact of antitrust injury but had failed to prove the amount of antitrust damages. Because of plaintiff's "utter failure to make any segregation between damages attributable to lawful competition and that attributable to

[defendant's] unlawful scheme," the Court reversed the jury's verdict and ordered a new trial on damages. *Id.* at 1352.

*Farley Transportation* provides an excellent illustration of the distinction between proof of antitrust injury and proof of antitrust damages. The decision demonstrates why the Court's charge as to nominal damages was not erroneous, and suggests at least one reason why the jury's verdict awarding the USFL only $1.00 in damages may have been entirely rational.

### b. *Nominal Damages in Antitrust Cases*

Plaintiffs maintain that the jury should not have been permitted, as a matter of law, to award nominal damages after finding defendants liable for violating section 2 of the Sherman Act.

Numerous federal courts have approved awards of nominal damages in antitrust cases, *see, e.g., Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n*, 666 F.2d 1130, 1147 (8th Cir.1981), *cert. denied*, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982). The validity of such a practice, however, was questioned in a footnote to the Second Circuit's decision in *Herman Schwabe, Inc. v. United Shoe Machinery, Inc.*, 297 F.2d 906 (2d Cir.), *cert. denied*, 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962).

The plaintiff in *Herman Schwabe* had sued the defendant, an adjudged monopolist of the shoe machinery market, for damages allegedly caused by defendant's unlawful conduct in the periods preceding and following the implementation of injunctive relief designed to halt defendant's illegal practices. The Court, per Judge Friendly, affirmed a directed verdict in defendant's favor. Although plaintiff had never argued that the trial court should have awarded nominal damages, the Court raised the question *sua sponte. Id.* at 909 n. 4. Having raised the question, the Court concluded that the failure to award nominal damages could not constitute error since "appellant has not sought reversal on this score." *Id.* Nonetheless, the Court observed that "the possibility of awarding nominal damages under § 4 of the Clayton Act ... seems dubious in light of the language of the statute and the Supreme Court opinions." *Id.* (citations omitted).

As defendants point out, however, the USFL's reliance on *Herman Schwabe* needs to be examined in light of what the Second Circuit actually decided in that case. In *Schwabe*, the Court held that since plaintiff had failed to offer any evidence permitting the jury to make a rational determination of damages, defendant was entitled to a directed verdict in its favor. *See* 297 F.2d at 915. The Court reached this decision notwithstanding the fact that defendant was an adjudged monopolist, noting that "mere proof that a defendant has injured its competitors generally [does not] warrant [ ] recovery in the absence of evidence that would justify a finding of injury to this particular plaintiff and would supply a rational basis for approximating its amount." *Id.* at 909–10. In addition, in affirming an award of *no* damages, the Court rejected the alternative of entering judgment in plaintiff's favor and awarding nominal damages. *See id.* at 909 n. 4. Thus, if the Second Circuit in *Herman Schwabe* had taken a different view of the availability of nominal damages under § 4 of the Clayton Act, it might have afforded plaintiff-appellant precisely the relief that the USFL received in this case from the jury. It is remarkably ironic that plaintiffs' claim of verdict infirmity should rest so heavily upon a decision which suggests that the USFL should perhaps have been awarded no damages at all.

Furthermore, the language in *Schwabe* relating to nominal damages should not necessarily be extended beyond the particular procedural context involved in that case. Construed in that manner, *Schwabe* stands for the proposition that where a trial court has directed a verdict in favor of an antitrust defendant, based on plaintiff's failure to prove damages, the court of appeals should not find grounds for reversal in the failure of the court below to enter judgment on plaintiff's behalf and award nominal damages. *See* 297

F.2d at 909 n. 4. That teaching, however, does not directly apply to the issue now before this Court, *i.e.*, whether it is within a jury's discretion to award nominal damages to an antitrust plaintiff. Significantly, the USFL has cited no authority which directly indicates that juries are without power to award nominal damages in antitrust actions. Indeed, even if such authority had been belatedly brought to this Court's attention, plaintiffs' failure to make any objection to the jury charge on nominal damages, *see* Court Exhibit G at 118, clearly deprives them of the right to assign error to that portion of the charge. *See* Fed.R.Civ.P. 51.[11]

### D. New Trial Based on Inadequacy of Damages Award

▇▇ The USFL also claims that the plain inadequacy of the damages award entitles plaintiffs to a new trial on damages. Such relief is justified "when the jury's verdict is less than the damages plaintiff actually has incurred and proven by undisputed evidence." *Caskey v. Village of Wayland*, 375 F.2d 1004, 1008 n. 4 (2d Cir.1967); *see Yodice v. Koninklijke Nederlandsche Stoomboot Maatschappij*, 471 F.2d 705, 707 (2d Cir.1972), *cert. denied*, 411 U.S. 933, 93 S.Ct. 1902, 36 L.Ed.2d 393 (1973); *see also Ohanian v. Avis Rent A Car System, Inc.*, 779 F.2d 101, 110 (2d Cir.1985) (before ordering new trial on damages, appellate court must find that it would be a denial of justice to permit the award to stand) (citations omitted).

Thus, in *Wheatley v. Beetar*, 637 F.2d 863 (2d Cir.1980), the Second Circuit ordered a new trial as to damages in a case in which the jury found that police officers had used excessive physical force in beating plaintiff, but awarded only $1.00 in damages despite undisputed evidence that plaintiff had suffered pain and suffering as a result of the beating. *See id.* at 866–67. Significantly, however, the Court also found the jury's failure to award damages for plaintiff's alleged ear injury and permanent hearing loss "could rationally be justified," *id.* at 865, in light of defendants' proof at trial that these injuries could have had other causes, *see id.* at 866.

In other words, an award of nominal damages is "within the jury's province" when it is supported by evidence in the record. *See id; cf. Caskey*, 375 F.2d at 1007–08 (federal court of appeals should not disturb a trial court's denial of a new trial for inadequacy or excessiveness of the verdict unless the denial is without support in the record).

In the case at bar, the jury was instructed that it could award nominal damages if it found that it could not, based on the evidence, make some quantifiable distinction between losses the USFL had suffered as a result of the NFL's wrongful conduct and losses the USFL had suffered as a result of "other factors, ... including business decisions made by the plaintiffs or plaintiffs' own mismanagement." Charge at 124. During trial, defendants offered extensive evidence of USFL mismanagement, including proof that the USFL had: 1) hastily abandoned their original concept of playing professional football in the Spring within sensible budgetary restraints; 2) engaged in a premature expansion from twelve to eighteen teams after its first season; 3) suffered from instability in both franchise ownership and location; and 4) deliberately embarked on a strategy of forcing a merger with the NFL, which the USFL pursued even when it forced the league to make business decisions adverse to its economic self-interest.[12] In response,

---

**11.** Plaintiffs argue that their overall objection to the Court's damages charge was sufficient to preserve a challenge to the charge on nominal damages. *See* Plaintiffs' New Trial Memorandum at 12 n. **; Plaintiff's New Trial Reply Memorandum at 8 n. **. The obligation of a party objecting to a proposed jury instruction, however, is to "stat[e] *distinctly* the matter to which he objects and the grounds of his objection." Fed.R.Civ.P. 51 (emphasis added).

**12.** One of the business decisions that the USFL made, not necessarily related to its desire to force a merger with the NFL, was to. file an antitrust lawsuit against the established league. When a firm which has committed myriad blunders in the marketplace seeks to gain benefits

plaintiffs attempted to demonstrate: 1) that some of the USFL's business decisions had not been as imprudent as defendants claimed; and 2) that most of the USFL's errant behavior could be traced to the effects of the NFL's anticompetitive conduct.

In this contest of proof it is reasonable to assume, based on the jury's award of nominal damages, that defendants' evidence was more compelling. Moreover, even if the jury concluded that the respective positions espoused by plaintiffs and defendants each had some merit, the USFL offered no evidence "permitting the jury to parse out which damages [were] attributable to [defendants'] unlawful competition" and which were attributable to plaintiffs' own business decisions and mismanagement. *Farley Transportation*, 786 F.2d at 1351. Under such circumstances, the jury knew that it was authorized to award nominal damages, *see* Charge at 124, and it is clear that such an award was supported by evidence in the record.[13]

### E. *Ruling on Motions for New Trial*

For all the reasons that have been discussed, plaintiffs have failed to convince this Court that they are entitled to a new trial. Accordingly, it is not necessary to reach the question of whether a new trial, if granted, should be limited to the issue of damages, as plaintiffs have requested. Nonetheless, in the interest of completeness, I have considered this matter below.

The Federal Rules of Civil Procedure specifically permits the court to grant a new trial "on all or part of the issues." Fed.R.Civ.P. 59(a). In *Gasoline Products Co. v. Champlin Refining Co.*, 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931), the Supreme Court held that:

> Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.

*Id.* at 500, 51 S.Ct. at 515; *accord Caskey* 375 F.2d at 1010.

Ironically, plaintiffs' own arguments for a new trial demonstrate the extent to which the issues of liability and damages are inextricably intertwined in this lawsuit. As an example, the USFL has argued at length that the jury reached a compromise verdict. Yet such a verdict, by its nature, raises the possibility that individual jurors held diverse views on the issue of defendants' liability. Limiting a new trial to damages under such circumstances would clearly be inadvisable, if not impermissible. *See Stanton v. Astra Pharmaceutical Products, Inc.*, 718 F.2d 553, 576 (3d Cir. 1983).

Moreover, the complex facts of this lawsuit are, in and of themselves, a sufficient basis for refusing to limit a new trial to the issue of damages. *See id.* In sum, I am convinced that if a new trial were warranted in this case—which it is not—it would be

---

through treble damages that it could not acquire through fair competition, neither juries nor courts should be condemned for obstructing such an effort. *Cf. Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 43 (2d Cir.1986) (affirming grant of summary judgment in favor of a defendant that had been sued by a plaintiff that had been publicly "searching for the means of entering the antitrust fray").

**13.** The jury was also told that they could award nominal damages if "plaintiffs failed to prove an amount of damages." Charge at 124. Before and during trial, the NFL argued that the testimony of plaintiffs' damages expert, Dr. Nina W. Cornell, "was so thoroughly riddled with false and unfounded assumptions, and was so speculative in its very nature, as to amount to no proof of any amount of damages." Defend-

ants' Memorandum in Opposition to Plaintiffs' Motions for New Trial and for Judgment N.O.V. on Certain Claims at 31. For example, defendants argued that Dr. Cornell's damages calculations were based on the flawed assumption that the experience of the American Football League in the 1960's could be used to predict USFL revenues in the 1980's. *Id.*

The jury in this case may have agreed with the NFL that Dr. Cornell's testimony was based on unsound assumptions and therefore have concluded that plaintiffs had simply failed to prove an amount of damages. This plausible explanation for the jury's award of nominal damages offers yet another reason for refusing to grant plaintiffs a new trial based on the inadequacy of the award.

necessary to relitigate the issue of liability as well as the issue of damages.

## II. MOTIONS FOR JUDGMENT N.O.V.

When deciding whether or not to grant a motion for judgment notwithstanding the verdict, "the trial court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 167 (2d Cir.1980). Accordingly, a jury verdict should be set aside only if, having viewed the evidence in a light most favorable to the non-moving party, and having given the non-movant benefit of all reasonable inferences, the trial court finds that:

1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or

2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.

*Id.* at 168; *accord Lopez v. McLean Trucking Co.*, 798 F.2d 611 (2d Cir.1986).

### A. *Motions by Plaintiffs*

In light of the legal standard just recited, I find no basis for granting any of plaintiffs' motions for judgment n.o.v. In essence, plaintiffs urge that certain of the jury's verdicts be overturned on the grounds that those verdicts were: 1) based on erroneous jury instructions; and/or 2) fundamentally inconsistent with the jury's finding that the NFL monopolized professional football in the United States. Both of these species of objection have been discussed earlier in this opinion. In short, I am satisfied that my instructions to the jury were consistent with the law of the Supreme Court and of this Circuit.

### B. *Motions by Defendants*

The NFL has moved for judgment n.o.v. with respect to the jury's finding that defendants had monopoly power in a relevant market consisting of professional football in the United States, and that defendants willfully acquired or maintained monopoly power in that market.

■ In support of this motion the NFL asserts three arguments. First, defendants argue that, in the antitrust sense, there is no product market of professional football. To prove the existence of a product market in a Section 2 case, the plaintiff must present evidence that a product or service is exchanged and that, from the buyer's perspective, there are no reasonably interchangeable alternatives, taking into consideration factors such as price, use and quality. *See, e.g., United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394–95, 76 S.Ct. 994, 1006–07, 100 L.Ed. 1264 (1956). Defendants argue that professional football is not a product which is bought or sold, but rather is properly understood as "an activity or process which incorporates buying and selling; it is a matrix of economic exchanges." Memorandum in Support of Defendants' Motion for Judgment N.O.V. on Monopolization of "Professional Football" at 8.

Indeed, it is apparent that professional football teams purchase various inputs from suppliers, including the services of players, officials and coaches. The teams also acquire fixed assets and capital goods such as stadia and equipment. There is also little dispute that the teams sell outputs to various buyers, including broadcast rights, spectator tickets, stadium and parking concessions and other products. *See American Football League v. National Football League*, 205 F.Supp. 60, 65 (D.Md. 1962), *aff'd*, 323 F.2d 124, 128 (4th Cir. 1963). The NFL's contention is that these various submarkets, rather than the entire business of professional football, are the effective areas of competition between the competing leagues. Defendants further argue that since plaintiffs have failed to prove monopolization in any of these submarkets, it is impossible for the NFL to be guilty of monopolizing the entire business of professional football.

■ This argument has superficial appeal, but ignores settled precedent that the

antitrust laws recognize, in effect, that the whole of a business is sometimes greater than the sum of its parts. *See, e.g., United States v. Phillipsburg National Bank & Trust Co.*, 399 U.S. 350, 361, 90 S.Ct. 2035, 2042, 26 L.Ed.2d 658 (1970) ("[T]he cluster of products and services termed commercial banking has economic significance well beyond the various products and services involved."). Moreover, in resolving the issue of the relevant market, the finder of fact must determine the area of effective meaningful competition under the circumstances of the particular case. *Fishman v. Wirtz*, 1981–2 Trade Cas. (CCH) ¶ 64,378 at 74,763 (N.D.Ill.1981).

■ In the trial of this action, plaintiffs presented evidence from which a jury could have reasonably concluded that the USFL's product of "professional football" competes against the NFL's comparable product. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion for Judgment N.O.V. at 5–13 (citing record proof). Furthermore, although plaintiffs may have failed to prove that defendants have monopolized certain submarkets related to the business of professional football, such as nationwide television network broadcasts, it does not inexorably follow that this particular failure of proof extended to the question of whether defendants have monopolized the business of professional football as a whole. "[S]ubmarkets are not a basis for the disregard of a broader line of commerce that has economic significance." *Phillipsburg National Bank*, 399 U.S. at 360, 90 S.Ct. at 2041 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 326, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962)). It is true that product submarkets may constitute "separate economic entities," *United States v. Grinnell Corp.*, 384 U.S. 563, 572, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966), but where the combination of a number of different products "reflects commercial realities," there is no barrier to considering the entire combination separately. *Id.* Indeed, in *Los Angeles Memorial Coliseum Commission v. National Football League*, 726 F.2d 1381 (9th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83

L.Ed.2d 331 (1984), the Court found that ample evidence had been presented from which the jury could have identified a relevant product market in professional football, noting that "to some extent, the NFL itself narrowly defined the relevant market by emphasizing that NFL football is a unique product." 726 F.2d at 1393. *See also Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 988 (D.C.Cir.1977), *cert. denied*, 436 U.S. 956, 98 S.Ct. 3069, 57 L.Ed.2d 1121 (1978) ("The relevant product market in this case is indisputably the business of professional football."). Based on these considerations, I decline to accept the NFL's argument that no evidence has been presented demonstrating the existence of a distinct product market for professional football.

■ Second, the NFL argues that there is no evidence in the record that proves that the NFL has monopoly power in any component (submarket) of professional football. Having determined that the jury could reasonably have concluded that the business of professional football constituted a relevant product market, I do not have to view the record through as narrow a lens as defendants suggest. Moreover, I find that plaintiffs' proof that defendants possess monopoly power in professional football in the United States was entirely adequate. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motion for Judgment N.O.V. at 14 & n. * (citing record proof that defendants receive approximately 95% of all the revenues generated by major league professional football). Since the jury was instructed that "a market share of 85% or higher is strong evidence of the existence of monopoly power," Charge at 39, it is apparent that the jury could reasonably have concluded that defendants possessed monopoly power.

■ Finally, the NFL argues that, even if it is assumed that a distinct market consisting of professional football exists, there is no evidence in the record of predatory conduct in the professional football market. To the contrary, there was a considerable

amount of evidence presented which could have formed the basis for the jury's finding that defendants had engaged in predatory conduct.[14] For example, during the trial, plaintiffs presented evidence, related to: 1) NFL efforts to co-opt USFL owners and potential owners; 2) the NFL's Supplemental-Draft of USFL players; 3) the NFL's shift to a 49–man roster; and 4) NFL activity directed at specific USFL franchises such as the Oakland Invaders. In addition, the jury's rejection of plaintiffs' television-related Section 1 claims does not mean that the jury could not have properly considered some of the NFL's television-related conduct to have been anticompetitive.[15]

In sum, defendants' arguments are not persuasive, and their motion for judgment n.o.v. must be denied.

## CONCLUSION

For the reasons stated herein, plaintiffs' motions for a new trial and for judgments notwithstanding the verdicts are denied. In addition, defendants' motion for judgment notwithstanding the verdict is denied.

SO ORDERED.

---

14. Defendants have argued that since the jury verdict sheet did not include an interrogatory asking the jury whether the defendants had willfully acquired or maintained monopoly power by means of anticompetitive or predatory conduct, the jury could have found defendants liable based upon entirely lawful conduct. Memorandum in Support of Defendants' Motion for Judgment N.O.V. on Monopolization of "Professional Football" at 21–22. This argument carries little weight, since the jury was instructed that with respect to the actual monopolization claim one of the elements they had to find by a preponderance of the evidence was that defendants actually acquired or maintained the monopoly through anticompetitive conduct. *See* Charge at 31.

15. At a minimum, the jury was allowed to consider defendants' television-related behavior, even if entirely lawful, as probative of the "purpose and character" of the remainder of NFL conduct under the jury's scrutiny. *Cf. UMW v. Pennington,* 381 U.S. 657, 670–71 n. 3, 85 S.Ct. 1585, 1593–94 n. 3, 14 L.Ed.2d 626 (1965) (citation omitted).